| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-1<br><br>Duane Morris LLP<br>James J. Holman, Esq. (jjholman@duanemorris.com)<br>Sommer L. Ross, Esq. (slross@duanemorris.com)<br>222 Delaware Avenue, Suite 1600<br>Wilmington, DE 19801-1659<br>T: (302) 657-4900<br>F: (302) 657-4901<br><br>*Counsel to PNC Bank, National Association* | |
| In re:<br><br>HOLLISTER CONSTRUCTION SERVICES, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 19-27439 (MBK) |

### LIMITED OBJECTION OF PNC BANK, NATIONAL ASSOCIATION TO THE DEBTOR'S APPLICATIONS FOR ENTRY OF ORDERS AUTHORIZING THE RETENTION AND EMPLOYMENT OF (I) 10X CEO COACHING, LLC [DOCKET NO. 36], (II) THE PARKLAND GROUP, INC. [DOCKET NO. 37], AND (III) LOWENSTEIN SANDLER LLP [DOCKET NO. 103]

PNC Bank, National Association ("PNC"), by and through its undersigned counsel, hereby files this limited objection ("Limited Objection") to the following retention applications filed by the above-captioned debtor ("Debtor"): (i) *Application of Debtors* [sic] *to (I) Employ and Retain 10X CEO Coaching, LLC, and (II) Designate Paul Belair as Chief Restructuring Officer for the Debtor Effective as of the Petition Date* [Docket no. 36] ("10X Retention Application"); (ii) *Debtor's Application for Entry of an Order Authorizing the Retention and Employment of The Parkland Group, Inc. as Financial Advisor to the Debtor Effective as of the Petition Date* [Docket No. 37] ("Parkland Retention Application"); and (iii) *Debtor's Application for Entry of an Order Authorizing the Retention and Employment of Lowenstein Sandler LLP as Counsel to the Debtor*

---

[1] The Debtor in this chapter 11 case and the last four digits of its taxpayer identification number is: Hollister Construction Services, LLC (5404).

DM3\6094779.1

*Effective as of the Petition Date* [Docket No. 103] ("Lowenstein Retention Application;" and together with the 10X Retention Application and the Parkland Retention Application, the "Retention Applications"). In support of this Limited Objection, PNC respectfully states as follows:

## PRELIMINARY STATEMENT

1. It is no secret that the Debtor's chapter 11 case hinges on the Debtor's ability to negotiate global settlement agreements with most, if not all, of its project owners and project stakeholders, and that the Debtor has a very narrow window within which to accomplish this goal.

2. While the Debtor recently indicated that it is making progress in reaching a resolution with certain project owners and subcontractors, it is unclear that there will be a sufficient number of settlements reached and that those settlements will (i) generate sufficient cash flow to the Debtor's estate and PNC, and/or (ii) cover the administrative costs associated with the Debtor's chapter 11 case.

3. PNC does not dispute that if the Debtor is going to remain a debtor-in-possession the Retention Applications are necessary, as is payment to the Professionals. However, since the Debtor has only a finite amount of cash on hand, all of which is PNC's cash collateral, and no current debtor-in-possession facility exists or appears to be on the horizon, PNC files this Limited Objection to note that it does not consent to use of its Cash Collateral for payment of professional fees.

## RELEVANT FACTUAL BACKGROUND

### A. The Debtor

4. The Debtor is a commercial construction services firm that provides construction management services, *i.e.*, professional management services for construction projects. The

Debtor does not perform construction work itself, but instead partners with subcontractors through the pre-construction, construction, and post-construction phases of a project to accomplish the goals established by the project owner and the project owner's professionals. *See Declaration of Brendan Murray in Support of First Day Relief* ("First Day Declaration"), Docket No. 15 at ¶ 5.

5. Specifically, the Debtor employs and oversees the work of vendors, contractors, subcontractors and materialmen (together, "Subcontractors") on the projects. Typically, the project owners compensate the Debtor pursuant to progress payment orders for the work performed on their projects. In turn, the Debtor pays the Subcontractors for the goods and/or services they provided for the particular project. *Id*. at ¶ 13. Project owner payments and receivables are the Debtor's sole source of operating revenue. *Id*. at ¶ 14.

6. Prior to the Petition Date (defined below), the Debtor was unable to fully service all of its project owners' projects. *Id*. at ¶ 34. The Debtor was also not able to ensure that its Subcontractors were paid on the agreed-upon schedule. *Id*. As a result, certain Subcontractors stopped performing on their contracts with the Debtor and certain project owners ceased making remittance or progress payments to the Debtor on projects that were pending or completed, but not yet paid in full. *Id*. at ¶ 35. As project owner payments are the Debtor's sole source of operating revenue, non-payment led to the Debtor experiencing significant operational cash flow and liquidity issues. *Id*.

**B.    The Chapter 11 Case**

7. On September 11, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

DM3\6094779.1

8. The Debtor is operating its business and managing its assets as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9. On September 23, 2019, the United States Trustee for the District of New Jersey appointed an Official Committee of Unsecured Creditors.

### C. PNC and The Secured Obligations

10. PNC is Debtor's secured creditor. PNC extended a line of credit to the Debtor in the principal amount of $15,000,000.00, as evidenced by a certain credit note dated December 30, 2015 (the "Credit Note") and related (i) Borrowing Base Rider dated November 13, 2014 between the Debtor and PNC and (ii) Security Agreement dated November 13, 2014 executed and delivered by the Debtor in favor of PNC (collectively, and together with the Credit Note and all other documents related to and/or evidencing the Line of Credit, as amended, supplemented, modified and/or restated prior to the date hereof, the "Line of Credit Loan Documents"). In addition, PNC loaned the Debtor the principal amount of $1,600,000.00 (the "Term Loan"). The Term Loan is evidenced by, *inter alia*, the Term Loan Note dated as of September 26, 2018 (the "Term Loan Note") (together, and with all other documents and/or restated prior to the date hereof, the "Term Loan Documents" and, together with the Line of Credit Loan Documents, the "PNC Credit Documents").

11. The Debtor's obligations under the PNC Credit Documents ("Secured Obligations") are secured by a first priority security interest and lien upon substantially all of the Debtor's assets, including, but not limited to, all of the Debtor's accounts receivable, cash, and other amounts on deposit or maintained in any account or accounts by the Debtor generated by the collection of accounts receivable, and the proceeds of any of the foregoing (the "Cash Collateral").

DM3\6094779.1

12. As of the Petition Date, the Debtor was in default of its Secured Obligations. In the aggregate, approximately $15,321,371 was due and owing to PNC as of the Petition Date.

### D. The Interim Cash Collateral Orders

13. On September 11, 2019, the Debtor filed *Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing and (D) Granting Related Relief* [Docket No. 14] (the "Cash Collateral Motion").

14. On September 16, 2019, the Court entered the *First Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and, (IV) Granting Related Relief* [Docket No. 90] (the "First Interim Cash Collateral Order"). The First Interim Cash Collateral Order authorized the Debtor's use of PNC's Cash Collateral pursuant to a one (1) week cash collateral budget that was approved by PNC and ran through September 24, 2019 (the "Week 1 Budget").

15. On September 25, 2019, the Court entered the *Second Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and, (IV) Granting Related Relief* [Docket No. 158] (the "Second Interim Cash Collateral Order"). The Second Interim Cash Collateral Order authorizes the Debtor's use of PNC's Cash Collateral pursuant to a second one (1) week cash collateral budget that was approved by PNC and runs through October 1, 2019 (the "Week 2 Budget").

16. The Court is scheduled to hold a further interim hearing on the Cash Collateral Motion, if necessary, on October 2, 2019. However, the Court authorized the parties to submit a consensual form of order governing the Debtor's further use of Cash Collateral on an interim basis

DM3\6094779.1

beyond October 1, 2019. A further hearing on the Cash Collateral Motion is scheduled for October 8, 2019.

### E. Post-Petition Financing

17. As of the date hereof, PNC has not consented to or provided the Debtor with any post-petition financing.

### F. The Retention Applications

#### i. The 10X Retention Application

18. On September 13, 2019, the Debtor filed the 10X Retention Application. By the 10X Retention Application, the Debtor requests authorization to retain 10X CEO Coaching, LLC ("10X") and to designate Paul Belair, the Managing Director of 10X, as Chief Restructuring Officer ("CRO") to the Debtor pursuant to sections 105(a) and 363 of the Bankruptcy Code. The terms of 10X's engagement are set forth in an "Engagement Letter" dated September 3, 2019, a copy of which is attached to the 10X Retention Application [Docket No. 36-1].

19. According to the 10X Retention Application, Mr. Belair commenced providing services to the Debtor in May 2016. 10X Retention Application at ¶ 24. Specifically, "Mr. Belair provided executive coaching services to various members of senior management for approximately $9,000 per month." *Id*.

20. The 10X Retention Application further provides that Mr. Belair was appointed as the Debtor's CRO in September, just prior to the Petition Date. *Id*.

21. Pursuant to the 10X Retention Application, the "Debtor will pay 10X the sum of $550.00 per hour for the CRO services." *Id*. at ¶ 17. In addition, if 10X retains independent contractors, the costs of such contractor will be passed on to the Debtor. *Id*. at ¶ 19.

22. Pursuant to the 10X Retention Application, in the ninety (90) days prior to the Petition Date the Debtor paid $79,828 to 10X for professional services performed and expenses incurred. *Id.* at ¶ 23.

23. Pursuant to the 10X Retention Application, 10X "received a retainer from the Debtor in the amount of $220,000" (the "10X Retainer"). *Id.* Absent from the 10X Retention Application is the date on which the 10X Retainer was actually received by 10X. *Id.*

24. With respect to the 10X Retainer, the Debtor requests authorization to apply the 10X Retainer to any prepetition fees and reimbursable expenses 10X may have incurred, but not yet billed to the Debtor, relating to the prepetition period. *Id.* at ¶ 25. The 10X Retention Application provides that any subsequent remaining balance of the 10X Retainer after payment of the requested prepetition fees and expenses "will constitute a retainer as security for post-petition services and expenses." *Id.* at ¶ 26.

### ii. The Parkland Retention Application

25. On September 13, 2019, the Debtor filed the Parkland Retention Application. By the Parkland Retention Application, the Debtor requests authorization to retain The Parkland Group, Inc. ("Parkland") as financial advisor to the Debtor pursuant to sections 327(a), 328, and 1107 of the Bankruptcy Code. The terms of Parkland's engagement are set forth in an "Engagement Agreement" dated July 31, 2019, a copy of which is attached as Exhibit A to the *Declaration of Larry Goddard in Support of Debtor Application for Entry of an Order Authorizing the Retention and Employment of The Parkland Group, Inc. as Financial Advisor to the Debtor* [Docket No. 37-1].

26. According to the Parkland Retention Application, Parkland commenced work for the Debtor on August 3, 2019. Parkland Retention Application at ¶ 19. "From that date through

7

the Petition Date, Parkland billed the Debtor $18,202.50 for services rendered and $856.34 for reimbursement of expenses for a total of $18,202.50. This amount was paid by Parkland applying it against a $20,000 retainer Parkland received from the Debtor on August 7, 2019" (the "First Parkland Retainer"). *Id*. at ¶ 19.

27. Additionally, "the Debtor paid Parkland a retainer in the amount of $100,000 for the Chapter 11 Case by wire transfer on September 10, 2019" (the "Second Parkland Retainer;" and together with the First Parkland Retainer, the "Parkland Retainers"). *Id*.

### iii. The Lowenstein Retention Application

28. On September 18, 2019, the Debtor filed the Lowenstein Retention Application. By the Lowenstein Retention Application, the Debtor requests authorization to retain Lowenstein Sandler LLP ("Lowenstein;" and, together with 10X and Parkland, the "Professionals") as counsel to the Debtor pursuant to sections 327(a), 329, and 330 of the Bankruptcy Code.

29. According to the Lowenstein Retention Application, Lowenstein commenced work for the Debtor on August 3, 2019. Lowenstein Retention Application at ¶ 18. "From that date through the Petition Date, Lowenstein billed the Debtor $140,518.50 for services rendered and $785.01 for reimbursement of expenses for a total of $141,303.51." *Id*. at ¶ 18. "This amount was paid to Lowenstein by wire transfer on September 10, 2019" (the "Lowenstein Prepetition Payment"). *Id*.

30. In addition, the Debtor paid Lowenstein "a retainer in the amount of $500,000 for the Chapter 11 Case by wire transfer on September 10, 2019" (the "Lowenstein Retainer;" and together with the 10X Retainer and Parkland Retainers, the "Retainers"). *Id*.

8

DM3\6094779.1

**LIMITED OBJECTION**

31.   PNC objects to each of the Retention Applications to the extent that any or all of them seek authority to use PNC's Cash Collateral to pay the Debtor's Professionals. In addition, PNC objects to each of the Retention Applications to the extent that any or all of them seek authority to compensate any Professional if such payment is not explicitly provided for in an agreed budget approved by PNC in the context of a court-approved Cash Collateral order.

32.   Further, the 10X Retention Application does not disclose (a) if any other 10X members or employees will be rendering services to the Debtor and if so, at what hourly rates, and (b) when the 10X Retainer was actually received.

**RESERVATION OF RIGHTS**

33.   PNC hereby reserves and preserves any and all rights afforded to it, either at law or in equity, to (i) seek disgorgement of any amounts paid to the Professionals, whether pre or post-petition, to the extent that such amounts were improperly funded by or paid from PNC's Cash Collateral, (ii) object to any fee application filed by any of the Professionals, (iii) enforce its rights and interests under the PNC Credit Documents, (iv) exercise the right to terminate or object to the Debtor's continued or future use of PNC's Cash Collateral, and/or (v) to take such other action as PNC may deem necessary and appropriate to preserve, protect, and enforce its rights under the PNC Credit Documents or other applicable law.

WHEREFORE, PNC respectfully requests that any Order entered granting the Retention Applications (i) provide that the Debtor's retention of the Professionals does not and shall not be deemed to authorize or approve the payment of any compensation or expenses to the Professionals from PNC's Cash Collateral unless expressly consented to by PNC; (ii) preserves any and all rights afforded to PNC, either at law or in equity, to: (a) seek disgorgement of any amounts paid to the

9

Professionals, whether pre or post-petition, to the extent that such amounts were improperly funded by or paid from PNC's Cash Collateral, (b) object to any fee application filed by any of the Professionals and (c) enforce its rights and interests under the PNC Credit Documents; (iv) exercise the right to terminate or object to the Debtor's continued or future use of PNC's Cash Collateral; and/or (v) to take such other action as PNC may deem necessary and appropriate to preserve, protect, and enforce its rights under the PNC Credit Documents or other applicable law; .and (vi) grant such other relief as is just and proper.

Respectfully submitted,

Dated: October 1, 2019

*/s/ Sommer L. Ross*
DUANE MORRIS LLP
James J. Holman, Esq. (NJ Bar No. 015341989)
Sommer L. Ross, Esq. (NJ Bar No. 004112005)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail: jjholman@duanemorris.com
slross@duanemorris.com

*Counsel for PNC Bank, National Association*