| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** Caption in Compliance with D.N.J. LBR 9004-1<br><br>Duane Morris LLP<br>James J. Holman, Esq. (jjholman@duanemorris.com)<br>Sommer L. Ross, Esq. (slross@duanemorris.com)<br>222 Delaware Avenue, Suite 1600<br>Wilmington, DE 19801-1659<br>T: (302) 657-4900<br>F: (302) 657-4901<br><br>*Counsel to PNC Bank, National Association* | |
| In re:<br><br>HOLLISTER CONSTRUCTION SERVICES, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 19-27439 (MBK)<br><br>Hearing Date: October 8, 2019 at 11:30 a.m. |

### LIMITED OBJECTION OF PNC BANK, NATIONAL ASSOCIATION TO THE MOTION OF NEWARK WAREHOUSE URBAN RENEWAL, LLC AND NEWARK WAREHOUSE REDEVELOPMENT COMPANY, LLC FOR AN ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY TO THE GMP CONTRACT OR, ALTERNATIVELY, GRANTING RELIEF FROM THE AUTOMATIC STAY [DOCKET NO. 170]

PNC Bank, National Association ("PNC"), by and through its undersigned counsel, hereby files this limited objection ("Limited Objection") to the *Motion of Newark Warehouse Urban Renewal, LLC and Newark Warehouse Redevelopment Company, LLC for an Order (I) Confirming that the GMP Contract Is Not Property of the Estate and that the Automatic Stay Does Not Apply to the GMP Contract Or, in the Alternative, Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1), and (II) Granting Related Relief* [Docket No. 170] (the "NWR Motion") filed by Newark Warehouse Urban Renewal, LLC and Newark Warehouse

---

[1] The Debtor in this chapter 11 case and the last four digits of its taxpayer identification number is: Hollister Construction Services, LLC (5404).

Redevelopment Company, LLC (together, the "NWR Entities"). In support of this Limited Objection, PNC respectfully states as follows:

## RELEVANT FACTUAL BACKGROUND

### A. The Debtor

1. Hollister Construction Services, LLC (the "Debtor") is a commercial construction services firm that provides construction management services, *i.e.*, professional management services for construction projects. The Debtor does not perform construction work itself, but instead partners with subcontractors through the pre-construction, construction, and post-construction phases of a project to accomplish the goals established by the project owner and the project owner's professionals. *See Declaration of Brendan Murray in Support of First Day Relief* ("First Day Declaration"), Docket No. 15 at ¶ 5.

2. Specifically, the Debtor employs and oversees the work of vendors, contractors, subcontractors and materialmen (together, "Subcontractors") on the projects. Typically, the project owners compensate the Debtor pursuant to progress payment orders for the work performed on their projects. In turn, the Debtor pays the Subcontractors for the goods and/or services they provided for the particular project. *Id*. at ¶ 13. Project owner payments and receivables are the Debtor's sole source of operating revenue. *Id*. at ¶ 14.

3. Prior to the Petition Date (defined below), the Debtor was unable to fully service all of its project owners' projects. *Id*. at ¶ 34. The Debtor was also not able to ensure that its Subcontractors were paid on the agreed-upon schedule. *Id*. As a result, certain Subcontractors stopped performing on their contracts with the Debtor and certain project owners ceased making remittance or progress payments to the Debtor on projects that were pending or completed, but not yet paid in full. *Id*. at ¶ 35. As project owner payments are the Debtor's sole source of operating

2

revenue, non-payment led to the Debtor experiencing significant operational cash flow and liquidity issues. *Id*.

### B. The Chapter 11 Case

4. On September 11, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

5. The Debtor is operating its business and managing its assets as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. On September 23, 2019, the United States Trustee for the District of New Jersey appointed an Official Committee of Unsecured Creditors.

### C. PNC and The Secured Obligations

7. PNC is Debtor's secured creditor. PNC extended a line of credit to the Debtor in the principal amount of $15,000,000.00, as evidenced by a certain credit note dated December 30, 2015 (the "Credit Note") and related (i) Borrowing Base Rider dated November 13, 2014 between the Debtor and PNC and (ii) Security Agreement dated November 13, 2014 executed and delivered by the Debtor in favor of PNC (collectively, and together with the Credit Note and all other documents related to and/or evidencing the Line of Credit, as amended, supplemented, modified and/or restated prior to the date hereof, the "Line of Credit Loan Documents"). In addition, PNC loaned the Debtor the principal amount of $1,600,000.00 (the "Term Loan"). The Term Loan is evidenced by, *inter alia*, the Term Loan Note dated as of September 26, 2018 (the "Term Loan Note") (together, and with all other documents and/or restated prior to the date hereof, the "Term Loan Documents" and, together with the Line of Credit Loan Documents, the "PNC Credit Documents").

8. The Debtor's obligations under the PNC Credit Documents ("Secured Obligations") are secured by a first priority security interest and lien upon substantially all of the Debtor's assets, including, but not limited to, all of the Debtor's accounts receivable, cash, and other amounts on deposit or maintained in any account or accounts by the Debtor generated by the collection of accounts receivable, and the proceeds of any of the foregoing (the "Cash Collateral").

9. As of the Petition Date, the Debtor was in default of its Secured Obligations. In the aggregate, approximately $15,321,371 was due and owing to PNC as of the Petition Date.

**D.  The Interim Cash Collateral Orders**

10. On the Petition Date, the Debtor filed *Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing and (D) Granting Related Relief* [Docket No. 14] (the "Cash Collateral Motion").

11. On September 16, 2019, the Court entered the *First Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and, (IV) Granting Related Relief* [Docket No. 90] (the "First Interim Cash Collateral Order"). The First Interim Cash Collateral Order authorized the Debtor's use of PNC's Cash Collateral pursuant to a one (1) week cash collateral budget that was approved by PNC and ran through September 24, 2019 (the "Week 1 Budget").

12. On September 25, 2019, the Court entered the *Second Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and, (IV) Granting Related Relief* [Docket No. 158] (the "Second Interim Cash Collateral Order"). The Second Interim Cash Collateral Order authorizes the Debtor's use of PNC's Cash Collateral

4

pursuant to a second one (1) week cash collateral budget that was approved by PNC and runs through October 1, 2019 (the "Week 2 Budget").

13. On October 2, 2019, the Court entered the *Third Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and, (IV) Granting Related Relief* [Docket No. 219] (the "Third Interim Cash Collateral Order"). The Third Interim Cash Collateral Order authorizes the Debtor's use of PNC's Cash Collateral pursuant to a third one (1) week cash collateral budget that was approved by PNC and runs through October 8, 2019 (the "Week 3 Budget").

14. A further hearing on the Cash Collateral Motion is scheduled for October 8, 2019.

### E. Post-Petition Financing

15. As of the date hereof, PNC has not consented to or provided the Debtor with any post-petition financing.

### D. The NWR Motion

16. On September 26, 2019, the NWR Entities filed the NWR Motion. By the NWR Motion, the NWR Entities request confirmation that a certain contract with the Debtor is not property of the Debtor's estate or, alternatively, relief from the automatic stay to enable the NWR Entities to terminate the contract. The NWR Entities further request authorization to issue certain outstanding joint checks (the "Joint Checks") to certain of the Debtor's subcontractors. NWR Motion at ¶ 68-70.

17. A hearing on the NWR Motion is scheduled for October 8, 2019.

## LIMITED OBJECTION

18. PNC objects to the NWR Motion to the extent that it requests authorization to issue the Joint Checks.

19. The disclosures set forth in the NWR Motion regarding the Joint Checks are inadequate. According to the NWR Motion, the NWR Entities, with the Debtor's acknowledgement and consent, began paying directly certain subcontractors of the Debtor via joint checks. NWR Motion at ¶ 68. The joint checks "required endorsement by both the Debtor and the particular subcontractor." *Id*.

20. The NWR Motion states that the "NWR Entities are currently in possession of [the Joint Checks] that they issued, and which the Debtors [sic] endorsed prior to the Petition Date, but have not yet been sent to the subcontractor for endorsement." *Id*. at ¶ 69. The NWR further states that the Joint Checks "are drawn on the NWR Entities' bank accounts, not the Debtor's bank accounts." *Id*. at ¶ 70. Because the Debtor has already endorsed the Joint Checks and the Debtor has no equitable interest in the funds, the NWR Entities submit that they are entitled to send the Joint Checks to the subcontractors. *Id*.

21. However, the NWR Motion does not disclose the dollar amounts of the Joint Checks. The NWR Motion also fails to state to which subcontractors the NWR Entities intend to issue the Joint Checks. Absent this information and the ability of parties in interest to analyze to the information, the NWR Motion should not be granted.

## RESERVATION OF RIGHTS

22. PNC hereby reserves and preserves any and all rights afforded to it, either at law or in equity, to (i) enforce its rights and interests under the PNC Credit Documents, (ii) exercise the right to terminate or object to the Debtor's continued or future use of PNC's Cash Collateral, and/or (iii) to take such other action as PNC may deem necessary and appropriate to preserve, protect, and enforce its rights under the PNC Credit Documents or other applicable law.

WHEREFORE, PNC respectfully requests that the Court require the NWR Entities disclose the dollar amounts of the Joint Checks and disclose the particular subcontractors to whom the Joint Checks will be issued and that any Order granting the NWR Motion (i) provide that issuing the Joint Checks does not and shall not be deemed to authorize or approve the payment or transfer to any of the Debtor's subcontractors from PNC's Cash Collateral unless expressly consented to by PNC; (ii) preserve any and all rights afforded to PNC, either at law or in equity, to: (a) enforce its rights and interests under the PNC Credit Documents; (b) exercise the right to terminate or object to the Debtor's continued or future use of PNC's Cash Collateral; and/or (c) to take such other action as PNC may deem necessary and appropriate to preserve, protect, and enforce its rights under the PNC Credit Documents or other applicable law; and (iii) grant such other relief as is just and proper.

Respectfully submitted,

Dated: October 7, 2019

*/s/ Sommer L. Ross*
DUANE MORRIS LLP
James J. Holman, Esq. (NJ Bar No. 015341989)
Sommer L. Ross, Esq. (NJ Bar No. 004112005)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail: jjholman@duanemorris.com
slross@duanemorris.com

*Counsel for PNC Bank, National Association*