RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Joseph L. Schwartz, Esq. (JS-5525)
Tara J. Schellhorn, Esq. (TS-8155)
Rachel G. Atkin, Esq. (RA-4910)
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey  07962-1981
(973) 538-0800

*Counsel to Plaintiffs and Counterclaim Defendants Newark Warehouse Urban Renewal, LLC and
Newark Warehouse Redevelopment Company, LLC*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>Hollister Construction Services, LLC,<br><br>                              Debtor. | Hon. Michael B. Kaplan, U.S.B.J.<br><br>Case No. 19-27439 (MBK)<br><br>Chapter 11 |
| NEWARK WAREHOUSE URBAN RENEWAL, LLC and NEWARK WAREHOUSE REDEVELOPMENT COMPANY, LLC,<br><br>                    Plaintiffs,<br><br>        v.<br><br>HOLLISTER CONSTRUCTION SERVICES, LLC, CHRISTOPHER JOHNSON, KIERAN FLANAGAN, BRENDAN MURRAY, JOHN DOES 1-100, JANE DOES 1-100, AND XYZ CORPORATIONS 1-100,<br><br>                    Defendants. | Adv. Pro. No. 19-02222 (MBK) |

HOLLISTER CONSTRUCTION SERVICES,
LLC,

        Counterclaimant,

   v.

NEWARK WAREHOUSE URBAN
RENEWAL, LLC and NEWARK
WAREHOUSE REDEVELOPMENT
COMPANY, LLC,

      Counterclaim Defendants.

HOLLISTER CONSTRUCTION SERVICES,
LLC,

       Third-Party Plaintiff,

   v.

EDISON CONSTRUCTION
MANAGEMENT, LLC and PASQUALE
SURIANO,

      Third-Party Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF NEWARK WAREHOUSE
URBAN RENEWAL, LLC AND NEWARK WAREHOUSE REDEVELOPMENT
COMPANY, LLC FOR AN ORDER REMANDING STATE COURT ACTION TO THE
SUPERIOR COURT OF NEW JERSEY, OR, IN THE ALTERNATIVE, ABSTAINING
FROM EXERCISING JURISDICTION OVER THE STATE COURT ACTION**

Newark Warehouse Urban Renewal, LLC and Newark Warehouse Redevelopment

Company, LLC (together, the "Plaintiffs" or the "NWR Entities"), by and through their

undersigned counsel, hereby submit this motion (the "Motion") for entry of an order,

substantially in the form submitted herewith, pursuant to 28 U.S.C. § 1452(b) and Rules 9014

and 9027(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") remanding

this adversary proceeding to the Superior Court of New Jersey, Essex County, Law Division (the

"State Court"), the court from which it was removed by defendant Hollister Construction

Services, LLC, the debtor in the above-referenced bankruptcy case (the "Debtor"), or, in the alternative, abstaining from hearing this lawsuit pursuant to either 28 U.S.C. §§ 1334(c)(1) or (c)(2).  In support of this Motion, the NWR Entities respectfully represent as follows:

## PRELIMINARY STATEMENT

Prior to the Petition Date (defined herein), the NWR Entities initiated the State Court Action (also defined herein) in the Superior Court of New Jersey, Law Division in Essex County against the Debtor and various third parties, including the Debtor's principals, alleging "garden variety," yet complex state construction law, breach of contract, negligence, fraud, breach of the New Jersey Consumer Fraud Act, breach of implied covenant of good faith and fair dealing, and negligent misrepresentation claims. In response to the State Court Action, the Debtor recently removed the lawsuit to this Court as an adversary proceeding, and, in an effort to justify that the State Court Action belongs in this Court, the Debtor has asserted patently frivolous counterclaims against the NWR Entities and third party claims against NWR affiliates to recover alleged "property of the estate."  Not only are the Debtor's counterclaims and third party complaint wholly without merit, but the Debtor's attempts to disguise its own "garden variety" breach of contract claim as a "core" proceeding have no basis.

For the reasons set forth herein, the NWR Entities respectfully submit that the Court should remand the State Court Action to the State Court pursuant to 28 U.S.C. § 1452(b) based on equitable grounds, or, in the alternative, abstain from hearing the State Court Action pursuant to either 28 U.S.C. §§ 1334(c)(1) or (c)(2).

## BACKGROUND

**A.**    **The GMP Contract.**[1]

1.    Newark Warehouse Urban Renewal, LLC owns a former warehouse building located at 110 Edison Place, Newark, New Jersey 07102 (the "Building"). Newark Warehouse Urban Renewal, LLC leases the Building to Newark Warehouse Redevelopment Company, LLC.

2.    On or about April 20, 2017, Newark Warehouse Urban Renewal, LLC and the Debtor entered into an Agreement For Construction Management Services and Guaranteed Maximum Price (and together with the Amendment (as defined herein), the "GMP Contract"). (Relevant excerpts of the GMP Contract were attached to the Suriano Cert. as Exhibit A.) Under the GMP Contract, the Debtor was designated the Construction Manager and was required to provide construction management services for a project involving the renovation of the Building (the "Project").

3.    The scope of the Project involved renovations to the core and shell of the Building, providing for a basement, six (6) stories as well as a newly-constructed penthouse addition, all totaling approximately 410,000 gross square feet.

4.    Section 3.6 of the GMP Contract contained a "time of the essence" provision that required the Debtor to complete the Project by no later than by September 1, 2018. Except for "Excusable Delay" (as defined in Section 1.1.37 of the GMP Contract), the Debtor could not change the timetable for completion of any portion of the Project without the express prior written approval of the NWR Entities.

---

[1] The facts in support of the Motion were set forth in the Certification of Pasquale Suriano (the "Suriano Cert.") submitted in support of the NWR Entities' Stay Relief Motion (defined herein). See Docket No. 170-1].

5.      Under the GMP Contract, the NWR Entities were required to pay the Debtor for, among other things, the cost of the work provided by the various subcontractors and material suppliers, plus a fee, with a guaranteed maximum price ("GMP").  The GMP under the GMP Contract was approximately $43,810,398.78.

6.      Pursuant to Section 2.1 of the GMP Contract, the Debtor agreed that the relationship between it and the NWR Entities was a "relationship of trust and confidence."  In connection with this trust arrangement, the Debtor expressly agreed to be fully responsible for, among other things, the payment of all subcontractors, and specifically agreed to:

> furnish efficient business administration and superintendence and to cause the Subcontractors (a) to furnish at all times an adequate supply of skilled workers and first-quality materials and defect-free workmanship and (b) to perform, or cause to be performed, the Work in an effective and sound way and in an expeditious and economical manner consistent with the interests of [the NWR Entities].

See Suriano Cert. Exhibit A, Section 2.1.

7.      The Debtor's representations and warranties under the GMP Contract expressly included representations and warranties related to the care, skill and diligence of the work to be performed by the Debtor's subcontractors, as well as with respect to the materials, supplies and equipment to be supplied through the Debtor's subcontractors.

8.      Further, pursuant to Section 12.2 of the GMP Contract, the Debtor was specifically required to utilize the funds it received from the NWR Entities to pay its subcontractors and suppliers, and, in the event that the Debtor withheld any payment to any subcontractor or supplier, the Debtor was required to immediately report such withholding and the reason for any such withholding to the NWR Entities.

9.     In addition, Section 12.9 of the GMP Contract provided that to the extent a subcontractor filed or caused to be filed any lien against the Building, the Debtor, at its sole cost and expense, would take the appropriate steps to cancel and discharge any such lien by reason of payment, bonding or other manner.

10.     On April 20, 2017, the Debtor agreed to commence construction activities for the Project, and in Section 3.1 of the GMP Contract, the Debtor agreed to work diligently to achieve final completion of the work by September 1, 2018.

**B.     The Debtor's Failure To Competently and Honestly Perform Under the GMP Contract.**

11.     Despite the Debtor's many contractual obligations under the GMP Contract, shortly after entering into the GMP Contract, the Debtor began demonstrating a complete inability to competently perform.

12.     Because of the Debtor's incompetence, on or about December 11, 2017, the NWR Entities issued a Notice of Delay to the Debtor relating to its demolition, structural work, saw cutting and steel erection, which caused delays for other subcontractors working on the Project.  At that point in time, nine (9) months of the Project schedule had elapsed with only seven (7) months remaining, and the Debtor had only completed approximately 20% of the work required for the Project.

13.     After its receipt of the Notice of Delay, the Debtor hired additional subcontractors for the Project, but failed to provide these subcontractors with appropriate guidance, direction or management, and without regard for the "time is of the essence" nature of the GMP Contract.

14.     As a result of the Debtor's non-payment of its subcontractors, by late December 2017, the Debtor's subcontractors began filing construction liens against the Building.

15.    To make matters worse, in an effort to induce the NWR Entities to allow the Debtor time to continue performing under the GMP Contract, by January 2018, certain of the Debtor's principals, including Christopher Johnson, Kieran Flanagan and Brendan Murray, began to repeatedly represent and assure the NWR Entities that the Debtor had already bonded or would bond all construction liens.  Ultimately, those representations and assurances proved to be false.

16.    By March of 2018, the Project was woefully behind schedule.  Because of its delays with regard to demolition, steel and window work, there were also additional delays to the stair and elevator work.  Despite these additional delays, and to induce the NWR Entities to allow the Debtor to continue to perform under the GMP Contract, the Debtor's principals continued to make false representations to the NWR Entities that the Debtor would take all necessary steps to meet all deadlines required under the GMP.

17.    By letter dated March 13, 2018, the NWR Entities demanded that the Debtor take all necessary measures to get the Project back on schedule.  To accomplish this, the Debtor requested that the NWR Entities prepay for certain window fabrication work that the Debtor had not completed.  To keep the Project progressing, the NWR Entities prepaid the Debtor for this incomplete work on April 5, 2018.

18.    Further, despite the Debtor's assurances in April of 2018 that all metal and glass deliveries in connection with the Project would be completed by May 15, 2018, no such deliveries occurred, and the Debtor continued to fail to provide any appropriate solutions to remedy the situation.  As a result, the NWR Entities were forced, at their own expense, to take over a large portion of the metal and glass work for the Project.

19.    Shockingly, in May of 2018, the NWR Entities discovered that the Debtor and/or its window subcontractor(s) were attempting to intentionally falsify test results on the windows installed in the Building by tampering with the installed window units to prevent water infiltration.

20.    On September 13, 2018, after the original completion date of September 1, 2018 had already elapsed, the NWR Entities issued a formal demand that the Debtor take all necessary steps to mitigate the NWR Entities' losses. Specifically, the NWR Entities demanded that the Debtor: (i) advise and provide a plan to mitigate unexcused delays and other various defaults; (ii) accelerate the construction work; (iii) provide evidence that the Debtor either bonded or discharged any and all subcontractor liens; (iv) pay subcontractors for future work; (v) pay for back charges to the design team for the design team's now extended construction administration services; (vi) provide the NWR Entities with a reconciliation showing how the Debtor had used the payments previously made by the NWR Entities; and (vii) recognize the NWR Entities' contractual right to take over construction management of the Project.

21.    Despite the NWR Entities' demands, the Debtor failed to adequately respond to the NWR Entities' requests. Accordingly, as a result of the ongoing delays, the NWR Entities had no choice but to retain their own steel subcontractor, as well as their own metal and glass subcontractor, and perform other uncompleted construction activities at the Project, all at the NWR Entities' additional cost and expense.

22.    Ultimately, in or around September of 2018, in an effort to prevent various subcontractors from walking off of the job as a result of nonpayment by the Debtor, with the Debtor's acknowledgement and agreement, the NWR Entities began issuing joint checks to both

the Debtor and certain subcontractors, which required endorsement by both the Debtor and these

subcontractors, for which the NWR Entities would be entitled to a credit from the Debtor.

23.     By November of 2018, the Debtor, after replacing its project management

team on several occasions, stopped providing any updated construction schedules as required by

the GMP Contract, and fell far behind in its payment of many of the subcontractors working on

the Project.   Yet, the Debtor's management team continued to provide the NWR Entities with

false promises and assurances regarding completion of the Project.   Despite the repeated

misrepresentations issued by the Debtor's principals, the Project completion date not only had

passed, but the Project was still months behind schedule.   There still remained window, metal

panel, balcony, louver installation, hardware installation, interior glass, railing, and curtain wall

work to be completed.   Additionally, metal and glass deliveries were grossly behind schedule.

**C.      The January 2019 Amendment to the GMP Contract.**

24.     On or about January 26, 2019, as a result of the Debtor's continued lack of

performance, the NWR Entities and the Debtor entered into negotiations for an Amendment to

the GMP Contract (the "Amendment"), which required, among other things, that the Debtor

bond or otherwise discharge all prior lien claims filed by the Debtor's subcontractors and that the

Debtor timely pay all of its subcontractors going forward.   See Suriano Cert., Exhibit B.

25.     Additionally, given the fact that the NWR Entities were themselves

contractually obligated to turn over certain space in the Building to certain of their tenants by

certain dates, the Amendment further provided that the Debtor would achieve substantial

completion of the 5th, 6th and 7th floors of the Building by no later than February 28, 2019, as

well as substantial completion of the remainder of the Project no later than April 16, 2019.   The

Debtor also agreed to obtain a temporary certificate of occupancy for the Building by no later

than April 16, 2019. Moreover, the Amendment further obligated the Debtor to pay liquidated damages to the NWR Entities and reimburse the NWR Entities for all costs of completion of the Project.

26.     Despite agreeing to these various conditions in the Amendment, the Debtor continued to fail to abide by its contractual responsibilities.

**D.    The NWR Entities' Discovery of the Debtor's Further Misrepresentations and Further Mismanagement.**

27.     In January 2019, in an attempt to make it appear as though the Debtor was accelerating its constructions activities, the Debtor hired additional subcontractors to perform certain work on the Project.

28.     These subcontractors, however, later informed the NWR Entities that they were retained at a higher "time and materials" rate than was provided by the GMP, which the Debtor clearly had no intention of paying, and which the NWR Entities were not obligated to pay beyond the cost of the GMP. Later, when the Debtor failed and refused to pay these subcontractors, the Debtor instead simply advised the subcontractors to seek payment directly from the NWR Entities, demonstrating the Debtor's complete lack of good faith and fraudulent intent in entering into the Amendment.

29.     Further, in or about late February of 2019, after the NWR Entities had issued a non-compliance notice to the Debtor with respect to certain electrical work, and after additional significant delays, the NWR Entities demanded a meeting with the Debtor and the Debtor's electrical subcontractor. At that time, the NWR Entities were advised that the Debtor's electrical subcontractor did not have the financial ability to complete its electrical work and had fraudulently provided the NWR Entities with a lien waiver stating that it had paid its own suppliers, when in fact it had not done so. As a result, the NWR Entities were forced to retain

their own electrical subcontractor, at additional cost, to complete the remainder of the electrical work at the Project and to re-do certain defective electrical work.

30.    By April 1, 2019, the Debtor still had not achieved substantial completion of the 5th, 6th and 7th floors of the Building, which, pursuant to the Amendment, the Debtor was required to achieve by February 28, 2019.

31.    Also, in or about May of 2019, the NWR Entities discovered that the Debtor's roofing manufacturer was denying its contractual thirty (30) year warranty of the roof as a result of certain penetrations in the roof membrane that resulted from improper glass railing shoe installation by the Debtor's subcontractors.  The NWR Entities further learned that the Debtor had already been aware of this issue for months and yet failed to take any remedial action.  After demanding that the Debtor take action to cure this situation, the Debtor failed to perform and the NWR Entities were forced to retain additional subcontractors, at their own additional expense, to remedy these roof issues.

32.    As of the summer 2019, the Debtor still had not provided the reconciliation of the Debtor's use of funds, nor had it provided proof that it had bonded all the construction liens filed against the Building.  Instead, the Debtor's principals simply continued to misrepresent to the NWR Entities that all construction liens filed against the Building had been bonded.[2]

---

[2] By way of example, on or about March 29, 2019, the Debtor provided the NWR Entities with documentation that purported to confirm that the Debtor had bonded certain liens in the amount of $831,746.28.  However, the NWR Entities subsequently learned that the bond documentation had not been properly executed or filed.

E.      **The Construction Liens Filed Against the Building By The Debtor's Subcontractors.**

33.      As a result of the Debtor's failure to timely pay its subcontractors, to date, the NWR Entities are aware of at least seventeen (17) liens that have been filed against the Building by various subcontractors, totaling in excess of $3.8 million.

34.      Additionally, over the past few months, the NWR Entities have been compelled to litigate numerous construction lien foreclosure lawsuits against the Debtor's subcontractors.   That litigation has continued despite the Court's issuance of an Order confirming the applicability of the automatic stay.  See Docket No. 140.

F.      **The NWR Entities' Termination of the GMP Contract.**

35.      Sections 14.5 and 14.6 of the GMP Contract provided the NWR Entities with the right to terminate the GMP Contract upon five (5) business days written notice, at any time, for cause, which includes, among other things, the Debtor's failure to make timely payments to its subcontractors, perform work within a timely manner, or strictly perform any material provisions of the GMP Contract.

36.      On July 11, 2019, and after very lengthy attempts to work with the Debtor to get the Project back on schedule and remedy the Debtor's numerous defaults, the NWR Entities issued a written notice of termination under the GMP Contract (the "July Termination Notice").[3]  The July Termination Notice provided the Debtor a period of forty-eight (48) hours to cure its defaults, and provided that termination of the GMP Contract became effective five (5) business days later – or July 18, 2019 – in accordance with Section 14.6 of the GMP Contract.

---

[3] A true and correct copy of the July Termination Notice was attached to the Suriano Cert. as Exhibit C.

37.     The Debtor failed to cure any of its defaults, however, and instead essentially abandoned the Project.  On September 5, 2019, the NWR Entities sent a letter confirming termination of the GMP Contract (the "September 5, 2019 Letter").[4]

**G.     The State Court Action.**

38.     On September 5, 2019, the NWR Entities also filed a complaint (the "Complaint")[5] against, among others, the Debtor, its principals, Christopher Johnson and Kieran Flanagan, and president Brendan Murray, in the Superior Court of New Jersey, Law Division, Essex County, captioned as Newark Warehouse Urban Renewal, LLC et al. v. Hollister Construction Services, LLC et al., Docket Number ESX-L-006514-19, seeking relief on various New Jersey state law causes of action, including breach of contract, negligence, fraud, breach of the New Jersey Consumer Fraud Act, breach of implied covenant of good faith and fair dealing, and negligent misrepresentation (the "State Court Action").

**H.     The Bankruptcy Case.**

39.     Shortly after the filing of the Complaint, on September 11, 2019 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code, commencing the above-referenced chapter 11 case (the "Bankruptcy Case").

40.     Since the Petition Date, the Debtor has remained in possession of its assets and affairs as a debtor-in-possession, pursuant to 11 U.S.C. §§ 1107 and 1108.

---

[4] A true and correct copy of the September 5, 2019 Letter was attached to the Suriano Cert. as Exhibit D.

[5] A true and correct copy of the Complaint is attached to the accompanying Certification of Joseph L. Schwartz as Exhibit A.

I.      **The Newark Entities' Motion for Relief from the Automatic Stay to Terminate the GMP Contract.**

41.     On September 26, 2019, the NWR Entities filed a motion with the Court for entry of an order: (i) confirming that the GMP Contract is not property of the Debtor's estate and that the automatic stay is inapplicable to the GMP Contract's termination, or, in the alternative, granting the NWR Entities relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1), and (ii) for related relief (the "Stay Relief Motion") [Docket No. 170].

42.     After a hearing on the Stay Relief Motion held on October 8, 2019, the Court entered an order on October 11, 2019 granting the NWR Entities relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) for "cause" to terminate the GMP Contract, determining that the GMP Contract was deemed terminated as of October 8, 2019 and determining that the NWR Entities are entitled to assert any and all of their non-monetary post-termination rights as set forth in the GMP Contract.  See Docket No. 303.

J.      **The Debtor's Removal of the State Court Action.**

43.     On October 9, 2019, the Debtor filed a Notice of Removal in the District Court for the District of New Jersey (the "District Court"), removing the State Court Action to the District Court pursuant to 28 U.S.C. §§ 1334(b), 1441(a) and 1452 and Fed. R. Bankr. P. 9027.  See Case No. 19-cv-18829-CCC-MF, Docket No. 1.

44.     In its Notice of Removal, the Debtor correctly stated that the State Court Action was a non-core, "related to" proceeding pursuant to 28 U.S.C. § 157(c)(1).  Id.

45.     On October 18, 2019 and October 23, 2019, the Debtor submitted letter requests to the District Court requesting referral of the State Court Action to this Court pursuant to the Standing Order of Reference to the Bankruptcy Court Under Title 11, entered by the

District Court on July 23, 1984, and amended on September 18, 2012.  <u>See</u> Case No. 19-cv-18829-CCC-MF, Docket Nos. 3 and 4.

46.    On October 23, 2019, the NWR Entities filed a Statement Pursuant to Fed. R. Bankr. P. 9027(e)(3) in Response to the Notice of Removal, in which the NWR Entities stated that they did not consent to the entry of final orders or judgments by this Court in connection with the State Court Action.  <u>See</u> Case No. 19-cv-18829-CCC-MF, Docket No. 5.

47.    On October 24, 2019, the District Court referred the State Court Action to this Court.  <u>See</u> Case No. 19-cv-18829-CCC-MF, Docket No. 6; <u>see also</u> Adv. Pro. No. 19-02222, Docket 1.

**K.    <u>The Debtor's Answer, Counterclaim, and Third Party Complaint.</u>**

48.    On October 29, 2019, the Debtor filed with this Court an Answer, Counterclaim, and Third Party Complaint to the State Court Action.  <u>See</u> Adv. Pro. No. 19-02222, Docket 3.

49.    The Debtor's counterclaim (the "<u>Counterclaim</u>") against the NWR Entities contains a number of "garden variety" state law causes of action against the NWR Entities, alleging, among other things, that the NWR Entities: (i) breached the GMP Contract and purportedly owe the Debtor "in excess of $16 million" (the "<u>Alleged GMP Contract A/R</u>"); (ii) wrongfully terminated the Debtor; (iii) violated the New Jersey Prompt Payment Act through their failure and refusal to pay the Debtor; (iv) breached their obligations to pay the Debtor in connection to work that was commonly referred to as the "Fit Out" (the "<u>Alleged Fit Out A/R</u>"); and (v) interfered with the Debtor's performance of the GMP Contract, allegedly resulting in damages.  <u>See</u> Answer, Counterclaim, and Third Party Complaint,  pp. 23-29.

50.     Through the Counterclaim, the Debtor requests: (i) a declaration that the Alleged GMP Contract A/R and the Alleged Fit Out A/R constitute property of the Debtor's estate pursuant to section 541 of the Bankruptcy Code, and (ii) the immediate turnover of the Alleged GMP Contract A/R and the Alleged Fit Out A/R pursuant to section 542 of the Bankruptcy Code.  The Counterclaim also seeks to disallow any claims of the NWR Entities against the Debtor pursuant to section 502(d) of the Bankruptcy Code.  See Answer, Counterclaim, and Third Party Complaint, pp. 29-33.

51.     Through its Third Party Complaint, the Debtor alleges that third-party defendants Edison Construction Management, LLC, an affiliate of the NWR Entities ("Edison"), and Pasquale Suriano, Executive Vice President of Engineering & Construction at Edison, breached a contract with the Debtor for work on a project commonly known as the "Columbia Street Extension;" violated the New Jersey Prompt Payment Act in connection therewith; and tortious interfered with the Debtor's contractual relationship with the NWR Entities by allegedly interfering with the Debtor's relationship with its subcontractors in connection with the Project. See Answer, Counterclaim, and Third Party Complaint, pp. 33-35.

52.     As explained herein, not only are the claims set forth in the Debtor's Counterclaim and Third Party Complaint utterly baseless, but they are simply "garden variety" state law causes of action that are, at best, "related to" the Debtor's Bankruptcy Case.

**RELIEF REQUESTED**

53.     By this Motion, the NWR Entities seek entry of an order, pursuant to 28 U.S.C. § 1452(b) and Bankruptcy Rules 9014 and 9027(d), remanding the State Court Action to the State Court, or, in the alternative, abstaining from hearing the State Court Action pursuant to 28 U.S.C. §§ 1334(c)(1) or (c)(2).

**ARGUMENT**

**I.    The Debtor's Counterclaim is Not A "Core" Proceeding and the NWR Entities Do Not Consent to Entry of Final Orders or Judgments With Respect to the Counterclaim.**

54.    As an initial matter, the Debtor asserts that the Counterclaim is a "core" proceeding. This is false. The Counterclaim asserts a number of state common law and statutory causes of action that exist outside of the Bankruptcy Case and do not invoke any substantive right created by federal bankruptcy law.  As a result, these claims are, at best, non-core, "related to" claims.  See In re Drauschak, 481 B.R. 330, 339 (Bankr. E.D. Pa. 2012) ("'[i]f the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding.'" (internal quotation omitted)). Moreover, although the Debtor asserted claims under section 541 and 542 of the Bankruptcy Code to recover alleged "property of the estate," these claims are merely an attempt by the Debtor to disguise its breach of contract claim as "core" claims in an effort to connect its claims to the Bankruptcy Case and the Bankruptcy Code, which is improper.  See Beard v. Braunstein, 914 F.2d 434, 445 (3d Cir. 1990) (holding that action alleging pre-petition breach of contract was entirely a non-core matter, not a "core" turnover proceeding under section 542 of the Bankruptcy Code); see also In re Drauschak, 481 B.R. at 342 ("'A turnover proceeding may qualify as core only when its purpose is collection rather than the creation, recognition, or liquidation of a matured debt.'") (internal citations omitted) (emphasis added); In re IPC Int'l Corp., No. 13-12050, 2014 WL 5544692, at *2–4 (Bankr. D. Del. Nov. 3, 2014) (explaining that a turnover action pursuant to section 542 of the Bankruptcy Code is "non-core' if it is improperly invoked, e.g., when there is a bona fide dispute as to liability.).

55.    For these reasons, the Counterclaim is, at best, a non-core "related to" proceeding, and the NWR Entities do not consent to entry of final orders or judgments by this Court with respect to the Counterclaim.

## II.    The State Court Action Should Be Remanded to the State Court.

56.    A motion to remand a state court litigation that has been removed to bankruptcy court is governed by 28 U.S.C. § 1452(b), which states that "[t]he court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground." 28 U.S.C. § 1452(b). This subsection grants "broad discretion" to the bankruptcy court to remand a removed proceeding back to the state court from which it was removed. Drauschak, 481 B.R. at 337.

57.    The term "equitable" as used in 28 U.S.C. § 1452(b) "is not to be understood as distinguishing equitable from legal grounds in a traditional sense, but, instead, 'equitable' 'signals what is reasonable, fair, or appropriate.'" In re Seven Fields Dev. Corp., 505 F.3d 237, 245 (3d Cir. 2007) (citing Allied Signal Recovery Tr. v. Allied Signal, Inc., 298 F.3d 263, 268 (3d Cir. 2002)).

58.    Bankruptcy courts in this district typically consider the following factors in exercising their discretion as to whether to equitably remand a state court litigation that has been removed to bankruptcy court:

(1) the effect on the efficient administration of the bankruptcy estate;

(2) the extent to which issues of state law predominate;

(3) the difficulty or unsettled nature of the applicable state law;

(4) comity;

(5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

(6) the existence of the right to a jury trial; and

(7) prejudice to the involuntarily removed defendants.

See In re Mid-Atl. Handling Sys., LLC, 304 B.R. 111, 126 (Bankr. D.N.J. 2003); In re Donington, Karcher, Salmond, Ronan & Rainone, P.A., 194 B.R. 750, 760 (D.N.J. 1996).

59.    Here, application of these factors weighs heavily in favor of remanding the State Court Action.  First, allowing the State Court Action to proceed as an adversary proceeding in this Court would be an inefficient use of estate resources, which are already quite limited, as this Court is well aware.

60.    Second, all of the causes of action asserted in the Complaint, the Counterclaim, and the Third Party Complaint involve either New Jersey statutory or common law claims that arose before the Petition Date.  The only causes of action implicating federal law are the Debtor's alleged claims for turnover of estate property, which, in addition to being completely frivolous, are nothing more than breach of contract claims that the Debtor has manufactured in a transparent effort to claim that this Court is the proper venue.  As a result, issues of state law clearly predominate and weigh in favor of remand.

61.    Third, the causes of action asserted in this State Court Action present complex state law construction law issues, including New Jersey Consumer Fraud Act claims, for which the State Court is the most appropriate forum.

62.    Fourth, general principles of comity and judicial economy favor remanding the State Court Action to the State Court.

63.     Fifth, the State Court Action, which involve claims against non-debtor third parties, is, at best, tangentially related to the Bankruptcy Case.  Indeed, the facts giving rise to the Complaint, Counterclaim and Third Party Complaint involve pre-petition events, complex construction law matters, fraud claims and at least seven (7) non-debtors: the NWR Entities, Edison, and Mssrs. Suriano, Johnson, Flanagan and Murray.  Further, the Debtor's attempts to create manufacture substantive rights under the Bankruptcy Code by asserting claims for turnover of estate property under sections 541 and 542 of the Bankruptcy Code are illusory, as the Debtor's alleged claims are utterly frivolous and will implicate complicated construction law issues.

64.     As a result, to the extent the Debtor has any claims against the NWR Entities, which the NWR Entities vehemently dispute, those claims are dwarfed by the NWR Entities' damage claims.[6]

65.     Sixth, the NWR Entities demanded a jury trial in the Complaint, and the NWR Entities do not consent to this Court conducting a jury trial with respect to the State Court Action.  See 11 U.S.C. § 157(e).  As a result, to the extent this factor has any relevance, it weighs in favor of remanding the State Court Action to the State Court.

66.     Finally, by virtue of the Counterclaim and Third Party Complaint asserted by the Debtor against the NWR Entities and against Edison and Mr. Suriano, the NWR Entities, Edison and Mr. Suriano are "involuntarily removed" non-debtor defendants who will be prejudiced by the State Court Action proceeding in this Court rather than in the State Court.

67.     Based on the foregoing, the NWR Entities submit that equitable grounds exist to remand the State Court Action, pursuant to 28 U.S.C. § 1452(b).

---

[6] The Debtor's counterclaim for the disallowance of the NWR Entities' claims pursuant to 11 U.S.C. § 502(d) is similarly illusory.

### III.   In the Alternative, the Court Should Abstain From Exercising Bankruptcy Jurisdiction.

68.     Bankruptcy jurisdiction under 28 U.S.C. § 1334(b) is original, but not exclusive.   Importantly, 28 U.S.C. §§ 1334(c)(1) and (c)(2) provide for permissive and mandatory abstention.   Once a court determines that it either must abstain under section 1334(c)(2), or that it should abstain under section 1334(c)(1), there exists an "equitable ground" justifying remand under 28 U.S.C. § 1452(b).   See Stoe v. Flaherty, 436 F.3d 209, 215 (3d Cir. 2006), as amended (Mar. 17, 2006) ("Once a district court determines that it either must abstain from hearing a removed case pursuant to 1334(c)(2) or should abstain pursuant to 1334(c)(1)'s permissive abstention provisions, it can consider whether there is reason for the suit to proceed in state court. If so, there will be an 'equitable ground' justifying remand under § 1452(b).").

### A.   The Court Is Required to Abstain Pursuant to 11 U.S.C. § 1334(c)(2).

69.     28 U.S.C. § 1334(c)(2), which governs mandatory abstention, provides that:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).

70.     Thus, even in a properly-removed action, a bankruptcy court is obligated to abstain from exercising jurisdiction when the requirements of 28 U.S.C. § 1334(c)(2) are met. As explained by the Third Circuit, the requirements are as follows:

> (1) the proceeding is based on a state law claim or cause of action; (2) the claim or cause of action is "related to" a case under title 11, but does not "arise under" title 11 and does not "arise in" a case under title 11, (3)

> federal courts would not have jurisdiction over the claim but for its
> relation to a bankruptcy case; (4) an action "is commenced" in a state
> forum of appropriate jurisdiction; and (5) the action can be "timely
> adjudicated" in a state forum of appropriate jurisdiction.

Stoe, 436 F.3d at 213.

71. Here, all five requirements are met. First, as set forth above, despite the Debtor's improper efforts to frame its breach of contract counterclaims against the NWR Entities as bankruptcy causes of action, the Complaint, the Counterclaim and the Third Party Complaint all assert "garden variety," yet complex New Jersey construction and fraud-related state law causes of action. Second, all claims, including those contained in the Counterclaim, as explained above, are, at best, "related to" this Bankruptcy Case, but do not "arise under" title 11 and do not "arise in" a case under title 11. Third, but for its relation to the Bankruptcy Case, the District Court would not have jurisdiction, as diversity among the parties is lacking. Fourth, the NWR Entities commenced the State Court Action by filing the Complaint in Superior Court of New Jersey, Essex County, Law Division, which is the appropriate forum. Fifth, the State Court can certainly timely adjudicate the State Court Action, whereas this Court should not be burdened with adjudicating complex state law issues involving non-debtors.

72. As a result of the above, the NWR Entities submit that the Court must abstain from hearing the State Court Action.

**B.** **Alternatively, the Court Should Exercise Its Permissive Authority to Abstain Pursuant to 11 U.S.C. § 1334(c)(1).**

73. In the alternative, the NWR Entities submit that grounds also exist for this Court, in its discretion, to abstain from hearing the State Court Action.

74. 28 U.S.C. § 1334(c)(1), which governs discretionary abstention, provides as follows:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with the State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1).

75.    The equitable considerations relevant to the appropriateness of discretionary abstention under section 1334(c)(1) are "essentially identical" to those utilized by courts to determine whether to order equitable remand, and, therefore, "a court's analysis is substantially the same for both types of relief." In re Mid-Atl. Handling Sys., LLC, 304 B.R. at 126 (citing In re Donington, Karcher, Salmond, Ronan & Rainone, P.A., 194 B.R. 750, 759-60 (D.N.J. 1996)).

76.    Thus, for the reasons set forth above with respect to equitable remand, the NWR Entities respectfully submit that sufficient grounds also exist for this Court to abstain, in its discretion, from hearing the State Court Action.

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, the NWR Entities respectfully request that the Court enter an order: (i) remanding the State Court Action to the State Court, or in the alternative, (ii) abstaining from hearing the State Court Action pursuant to either 28 U.S.C. §§ 1334(c)(1) or (c)(2), and (iii) granting NWR Entities such other and further relief as the Court deems just and equitable.

Dated: November 8, 2019
Morristown, New Jersey

RIKER DANZIG SCHERER HYLAND
& PERRETTI LLP


By:  /s/    *Joseph L. Schwartz*
　　　　　Joseph L. Schwartz

Joseph L. Schwartz, Esq. (JS-5525)
Tara J. Schellhorn, Esq. (TS-8155)
Rachel G. Atkin, Esq. (RA-4910)
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey  07962-1981
(973) 538-0800

*Counsel to Plaintiffs and Counterclaim Defendants
Newark Warehouse Urban Renewal, LLC and
Newark Warehouse Redevelopment Company, LLC*

5088231v3