**McMANIMON, SCOTLAND & BAUMANN, LLC**
75 Livingston Avenue, Suite 201
Roseland, New Jersey  07068
(973) 622-1800
Sam Della Fera, Jr. (sdellafera@msbnj.com)
Joshua H. Raymond (jraymond@msbnj.com)
*Attorneys for Official Committee of Unsecured*
*Creditors of Hollister Construction Services, LLC*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>HOLLISTER CONSTRUCTION SERVICES, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 19-27439 (MBK)<br><br>Hearing Date:  March 5, 2020<br>                       at 10:00 a.m. |

**RENEWED MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' TO CONVERT DEBTOR'S CHAPTER 11 CASE TO CHAPTER 7**

The Official Committee of Unsecured Creditors (the "Committee") of Hollister Construction Services, LLC (the "Debtor"), by and through its counsel, McManimon, Scotland & Baumann, LLC, hereby moves for the entry of an order converting this chapter 11 case to one under chapter 7.  In support thereof, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. On November 4, 2019, the Committee filed a Cross-Motion to Convert Debtor's Case to Chapter 7 (the "Conversion Motion") [Docket No. 406].[1]  The Court denied the Conversion Motion without prejudice by order dated November 22, 2019 (the "Order") [Docket No. 564].

---

[1] The Committee incorporates by reference herein the pleadings it previously filed in support of the Conversion Motion.

2. Pursuant to the terms of the Order, the Committee is authorized to relist the Conversion Motion on two days' notice to all interested parties. It is doing so now because, among other things, (a) professional fees incurred to date, net of carve-outs, retainers, and the fees necessary to file, confirm, and consummate a chapter 11 plan, exceed projected available funds by more than $1.3 million; (b) PNC Bank, N.A. ("PNC"), the Debtor's secured creditor, is projected to receive only about $4 million on its $15 million secured claim; and (c) filed unsecured claims presently exceed $800 million, including a $3.8 million priority tax claim filed by the State of New Jersey, with little hope of a dividend. With no unencumbered cash on hand, and no exit strategy, the Debtor has no ability whatsoever to confirm a chapter 11 plan.

3. The Debtor's chapter 11 case has been a liquidating one since its commencement. The proceeds from the settlements proffered by the Debtor, and the few remaining sources of revenue, demonstrate that the Debtor's stated purpose for maintaining this case in chapter 11 -- i.e., generating sufficient funds to pay PNC's secured claim and all administrative claims, with a subsequent dividend to unsecured creditors -- is not achievable. The project settlements have now stopped, and the Debtor's own projections demonstrate that neither administrative creditors nor PNC will be paid in full, or even nearly so.

4. A chapter 7 trustee can ensure the completion of ongoing projects, prosecute causes of action, and determine the allowance of claims as well as the debtor-in-possession, and at a lower cost, without the need to confirm a plan. For the reasons set forth below, and those otherwise of record in this case, the Court should formalize and economize the liquidation process by converting this case to chapter 7, to reduce administrative costs and to allow the monetization of the estate's assets to be aggressively pursued by an independent fiduciary for the benefit of all creditors.

4812-8645-2406, v. 1

**BACKGROUND FACTS**

5.  On September 11, 2019, the Debtor filed a voluntary petition under chapter 11 of Title 11 of the United States Code (the "Petition Date"), 11 U.S.C. § 101 (the "Bankruptcy Code") in this Court.

6.  The Debtor also filed on the Petition Date the Declaration of Brendan Murray in Support of First Day Relief ("Murray Declaration") [Docket No. 15], in which the Debtor's President explains that that "Project Owner payments and receivables are the Debtor's sole source of operating revenue." Murray Declaration at ¶14.

7.  On September 23, 2019, the Office of the United States Trustee appointed the Committee.

8.  On October 17, 2019, five weeks after the Petition Date, the Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules"). [Docket No. 340]

9.  On October 24, 2019, the Office of the United States Trustee conducted the meeting of creditors pursuant to Bankruptcy Code section 341(a). Paul Belair, the Debtor's CRO, and Sean Camo, its Chief Financial Officer and Controller, testified that the Debtor's bankruptcy filing was the result of (i) a business model that grew too fast, (ii) the Debtor not having employees experienced enough to handle the projects, and (iii) the Debtor's inadequate cash position. See Certification of Joshua H. Raymond, Esq., filed in support of the Conversion Motion, [Docket No. 406-1]. A review of the Schedules and the Debtor's monthly operating reports ("MORs") filed to date, however, demonstrates more specifically why the Debtor found itself, and continues to find itself, strapped for cash.

**Post-Petition Diminution of the Estate**

10. The Debtor ceased operating in the ordinary course of its business months before the Petition Date; among other things, it (a) abandoned construction projects that it was contracted to oversee, (b) laid off dozens of employees, (c) maxed-out on its prepetition credit facilities with PNC, (d) paid certain subcontractors hundreds of thousands of dollars for their work with company credit cards due to a lack of cash, and (e) paid other subcontractors absolutely nothing – resulting in the filing of $15 million in construction liens against certain projects.[2] The Debtor's financial condition since the Petition Date has only gotten worse.

11. On December 24, 2019, the Debtor filed its MORs for October 2019 and November 2019. The Debtor has failed to file MORs for December 2019 and January 2020, which are long past due, thus leaving the Court, the Committee, and all parties in interest without sufficient information about the Debtor's current financial ability to remain viable as a debtor-in-possession and to confirm a chapter 11 plan of reorganization.

12. As of its November 2019 MOR, the Debtor had negative cash flow of $431,358 and generated a cumulative net loss since the Petition Date of $2,550,833;[3] it accrued more than $180,000 in post-petition accounts payable;[4] and its cash on hand was less than 10% of the amount available on the Petition Date (only $132,954).[5]

13. Although it has determined to file more than two dozen adversary proceedings against certain "uncooperative" subcontractors to avoid and recover preferential transfers, other than a single settlement with Saxum Real Estate Companies LLC, the Debtor has failed in the past

---

[2] See Murray Declaration at ¶¶ 22-26, 30, and 34-37.
[3] See MOR for period ending November 20, 2019 ("November MOR") [Docket No. 710] at pp. 2 and 6.
[4] Id. at p. 10.
[5] Id. at p. 2.

4812-8645-2406, v. 1

nearly six months to recover any portion of the more than $4.1 million <u>scheduled</u> note and other loan receivables due from its principals, employees, and affiliates.[6] The actual amount of such receivables may be significantly higher.[7]

14. By March 6, 2020, less than six months after the Petition Date, pursuant to all the interim cash collateral orders entered to date, the Debtor will have burned through more than $4.5 million in net cash disbursements for a company that is essentially not operating. The Debtor's use of cash is conditioned upon and in exchange for substantial adequate protection in favor of PNC, who has received a post-petition replacement lien and a super-priority administrative expense claim, and also asserts more than $1.2 million in liens on avoidance actions and the proceeds thereof to the extent of the diminution in the bank's prepetition collateral, all to the substantial detriment of general unsecured creditors.[8]

15. The Debtor's spending has been so profligate, and its revenues so sparse, that at the conclusion of the current cash collateral budget period on March 6, 2020, the Debtor is projected to have a grand total of only $538,537 in cash on hand. The claims against the estate presently total more than $800 million, and professional fees net of carve-outs and retainers presently approximate $1 million, making even more inexcusable the Debtor's refusal in the past nearly six months to seek payment of any of the several million dollars due and owing from the Debtor's insiders and affiliates, and the insiders and affiliates of the Debtor's principals, as disclosed in the Schedules.

---

[6] <u>See</u> Schedule A/B: Assets – Real and Personal Property [Docket No. 340] at p. 16 of 278.

[7] The Debtor has engaged Bernard Katz as an independent manager to, among other things, investigate claims against the Debtor's insiders and affiliates. To date, no useful information relating to that investigation has been shared with the Committee.

[8] <u>See</u> First through Amended Thirteenth Interim Orders authorizing the Debtor's use of cash collateral. [Docket Nos. 90, 158, 219, 279, 359, 463, 556, 639, 688, 776, 821, 855, 885, 915 and 947.]

4812-8645-2406, v. 1

**Inadequate Project Settlement Recoveries**

16.     At the outset of this case, the Debtor conceded that the success of the chapter 11 "hinges on the Debtor's negotiations with the Project Owners, Subcontractors, property owners and [surety] to complete the Projects."[9] Debtor's counsel has stated on the record multiple times in open court that the negotiated settlements were expected to generate revenues sufficient to pay PNC substantially in full, and thereafter to fund administrative expenses and a distribution to unsecured creditors.

17.     The Debtor will no doubt continue to describe its ongoing efforts to negotiate settlements with project owners, their subcontractors, and other parties. But to the extent that the Debtor has made those efforts to date, they have borne little fruit. While the Debtor has argued that the settlements have provided significant benefit to creditors as a whole, the facts demonstrate that the benefits of the settlements have been overstated, benefitting only a fraction of all creditors.

18.     From the Petition Date through the end of the Debtor's 26-week cash budget period in mid-July 2020, the projected settlement recoveries are $11.6 million. However, after deducting subcontractor payments and other costs, the net recovery to the estate from the various project and other settlements is only $4.8 million – far less than the $9 million to $11 million upon which the Debtor had based its project settlement program. After deducting the agreed carve-out of $1.6 million for professional fees, the projected net recovery for PNC is less than $3.3 million on its more than $15 million secured claim.[10] Thus, the recovery to PNC is woefully insufficient to satisfy even the bank's secured claim and leaves nothing for unsecured creditors.

---

[9] Murray Declaration at ¶43.

[10] PNC will also recover from the ongoing operations of Debtor as portrayed in the 26-week cash budget. PNC is budgeted to receive $315,000 in interest, $185,453 in loan payments, $15,000 in bank fees, and $320,707 in loan principal from excess cash from the Debtor's operations. Even adding these recoveries to the settlement proceeds, PNC will only collect $4.1 million.

4812-8645-2406, v. 1

**No Dividend for Unsecured Creditors**

19.     Based upon a review of filed claims, allowed general unsecured claims will likely exceed $100 million. This amount does not include Arch Insurance Group's filed claim of $606.6 million, or personal injury claims of approximately $115 million. When they are included, general unsecured claims exceed $800 million. At that number, it would take $4 million to pay a half-cent dividend; presently, the estate has <u>no</u> unencumbered cash. How much worse could a chapter 7 trustee do?

20.     Significantly, the State of New Jersey, Division of Taxation, has filed a priority tax claim in the amount of $3.7 million. The Debtor has formally protested this liability but, if accurate, the claim amount ensures that the dividend to unsecured creditors in this case, even with a settlement amount agreed to by PNC and the elimination of Arch Insurance's claim, will be at best infinitesimal.[11]

21.     As part of the settlements with project owners, the Debtor has trumpeted the fact that settling subcontractors will be paid 40% of their pre-petition amount due from Hollister. To date, the gross amount of payables to subcontractors (including retainage) related to the settlements is approximately $16.3 million. The subcontractors who received 40% of their receivables as part of these settlements (<u>i.e.</u>, $6.5 million), comprise only approximately 20% in number of the holders Debtor's scheduled unsecured debt of $84.1 million. The dollar percentage of claims of the settling subcontractors represent an even smaller fraction of all unsecured debt.

---

[11] The deadline for governmental units to file their claims is March 9, 2020, so additional priority tax claims still may be filed.

22. On the basis of filed claims, the unsecured creditor pool is more than $800 million. Thus, the settling creditors hold only 2% of the estate's unsecured debt. Contrary to the Debtor's arguments, few creditors and fewer claims have received a limited benefit in chapter 11.

23. Also worth noting, while the settlements provided cash flow to the Debtor (much of which was used to pay its principals), in exchange, the Debtor provided releases on $9.6 million of gross preferences for settled projects in New Jersey alone. Even applying a minimal net recovery rate of 10%, the releases related to these projects cost the unsecured creditors approximately $1 million, far more than the amount that is now available to such creditors in chapter 11, which is essentially nothing.

**Administrative Insolvency**

24. Not only is the anticipated recovery for PNC's secured claim anemic and the dividend for unsecured creditors non-existent, the funds available for professional fees and other administrative expenses are also woefully inadequate to confirm a chapter 11 plan. Unpaid professional fees have rendered the Debtor administratively insolvent.

25. The 26-week cash flow provided to Committee counsel by the Debtor indicates a professional fee deficiency of $1.3 million after application of the carve-out of $1.6 million; but the reality is even worse.

26. The budgeted fee deficiency presumes that fees from inception through January 17, 2020, are $995,000 for all professionals. Recently, Debtor's counsel filed its fee applications from September to December. These applications include $415,600 in fees and costs incurred by counsel in September, $517,000 in October, $540,000 in November and $385,628 in December. The almost $1.9 million fees incurred by Debtor's counsel alone are almost double the budgeted $995,000 for all professionals through the week ending January 17, 2020.

27. If all professionals other than the Debtor's counsel were on budget through January 17, and Debtor's counsel did not exceed budgeted fees of $75,000 for the week ending January 10 and $75,000 budgeted fees for the week ending January 17, then the starting shortfall would be $963,228 at the beginning of the 26-week cash flow period.

28. The shortage of $963,228 for the period from inception to January, combined with the projected shortfall of $1,269,816 for the 26-week cash flow period commencing January 24, 2020, equals a $2.2 million shortfall for the professional fees though July. Even after applying the retainers of $500,000 for the Debtor's counsel and $200,000 for Paul Belair and 10X CEO Coaching, the Debtor's own projected professional fee deficiency is roughly $1.5 million.

29. Significantly, the professional fees projected in the 26-week budget do not include fees for preparing a disclosure statement, and filing, confirming, and consummating a plan; the cost of these chapter 11 prerequisites, not to mention the claims reconciliation process, will only add to the existing $1.5 million professional fee shortfall.

30. Due to the absence of (a) adequate working capital, (b) executed settlement agreements generating sufficient proceeds in the aggregate to satisfy PNC <u>and</u> administrative claims, with excess funds available for distribution to unsecured creditors, and (c) the Debtor's unwillingness to demand and seek recovery from its principals and other insiders, and for the other reasons set forth herein and in the Committee's initial Conversion Motion the Court should convert this case to chapter 7 so that a trustee can more equitably and effectively pursue claims and liquidate the Debtor's assets for the benefit of all creditors.

### **ARGUMENT IN SUPPORT OF CONVERSION TO CHAPTER 7**

31. "[O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter,

whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). This section further defines "cause" to include, in relevant part:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; [or]
>
> (B) gross mismanagement of the estate;

11 U.S.C. § 1112(b)(4).

32. This list provided in 11 U.S.C. § 1112(b) is illustrative, not exhaustive, and courts are free to consider other grounds. See e.g., In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999).

33. "The purpose of § 1112(b) is to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'" Loop Corp. v. United States Trustee, 379 F. 3d 511, 516 (8th Cir. 2004) (quoting In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)) cert. denied, 543 U.S. 1044 (2005). "In the context of a debtor who has ceased business operations and liquidated virtually all if its assets, any negative cash flow – including that resulting only from administrative expenses, effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of § 1112(b)(1)." Id.

34. Thus, in Loop, the circuit court affirmed the conversion of debtors' chapter 11 cases to chapter 7 on the grounds that "first, the ongoing expenses associated with administering the estate and attempting to negotiate a confirmable plan [following sale of most of the debtor's assets] constituted 'continuing loss to or diminution of the estate' and second, the debtor were liquidating and therefore had no likelihood of rehabilitation." Id. at 514-15 (quoting 11 U.S.C. § 1112(b)(1)).

35. In reaching this conclusion, the court noted that the bankruptcy court had found chapter 7 preferable to chapter 11 for several reasons, including: (i) "this court's uncertainty about whether the debtors would ever be able to propose a confirmable plan under Chapter 11;" (ii) "the expenses associated with even attempting to negotiate such a plan;" (iii) "the running of administrative expenses;" and (iv) "the expenses of a disbursing agent and other professionals whose services would be necessary should the parties ever agree on a confirmable plan." Id. at 518. "Conversion to Chapter 7," the appellate court found, "would eliminate the expenses associated with confirmation of a plan and likely would ensure prompt distribution of the remaining cash to the unsecured creditors." Id.

36. Furthermore, Bankruptcy Code section 1112(b)(4)(A) requires conversion (or dismissal) of a chapter 11 case if there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). These requirements are met in this case.

37. Diminution of an estate exists where, for example, the debtor's business has ceased, or debtor's liabilities outstrip its assets. See In re Johnston, 149 B.R. 158, 162 (B.A.P. 9th Cir. 1992); In re Citi-Toledo Partners, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994). A debtor lacks "a reasonable likelihood of rehabilitation" where, for example, it lacks income, operating funds, employees, or "continuing revenue-generating activity." See id. at 606-07, 609; see also Johnston, 149 B.R. at 162.

38. A chapter 11 debtor's inability to present a confirmable plan of reorganization and lack of sufficient financing to fund a plan constitute "cause" for conversion of a chapter 11 case to chapter 7. See, e.g., Halvajian v. Bank of N.Y. (In re Halvajian), 216 B.R. 502, 511-13 (D.N.J. 1998) (holding that chapter 11 debtor's inability to present confirmable plan of reorganization,

debtor's inability to reach workout agreement with any of its creditors, lack of sufficient financing to fund plan, and absence of any creditor acceptance for debtor's proposed plan constituted "cause" for conversion of chapter 11 case to chapter 7), aff'd, 168 F.3d 478 (3d Cir. 1998); Faden v. Faden, 1990 WL 191861 at **3-4 (D.N.J. Nov. 5, 1990) (affirming conversion of chapter 11 case to chapter 7 on grounds of continuing loss to estate and impossibility for rehabilitation, and debtor's inability to effectuate a plan); In re 865 Centennial Ave. Assocs. Ltd. Partnership, 200 B.R. 800, 810 (Bankr. D.N.J. 1996) ("Where the debtor has no cash flow and no source of income . . . a debtor has not demonstrated a reasonable likelihood of rehabilitation and dismissal may be appropriate").

39. The Debtor is unable to reorganize based on its settlements with project owners and subcontractors, and the collection of accounts receivable. Almost six months into the case, the Debtor has shown no ability to generate enough settlement proceeds to pay off PNC, with funds thereafter available to pay administrative costs and unsecured claims.

40. The Debtor's November MOR shows a net loss of $2,550,833, and demonstrates a rapid reduction in cash. The budgets annexed to the various cash collateral orders further verify the diminution in cash that constitutes PNC's cash collateral. Given the mounting administrative expenses, the uncertainty regarding whether the Debtor can propose a confirmable plan, and the expenses associated with confirming and consummating a plan, this case should not continue in chapter 11.

41. The only material assets remaining are avoidance actions, and causes of action against the Debtor's affiliates, officers, directors, employees and tangentially related entities, which the Debtor has refused to pursue. As such, it is clear that the assets of the estate are diminishing and there is no reasonable likelihood of rehabilitation; therefor, cause exists to convert

the case to chapter 7. See e.g. In re FRGR Managing Member, LLC, 419 B.R. 576, 583 (Bankr. S.D.N.Y. 2009) (granting motion to convert when debtor's only real asset was litigation).

42. In sum, the Court should convert the within case because:

   a. there is a continuing loss to and diminution of the Debtor's bankruptcy estate;

   b. there is an absence of a reasonable likelihood of rehabilitation;

   c. there is an unexcused failure to seek payment of substantial amounts due from insiders and affiliates; and

   d. the Debtor has failed to provide the Committee with any evidence to support its assertion that it will be able to reorganize.

## CONCLUSION

43. More than $1.5 million in chapter 11 professional fees cannot be paid in this case, and claims exceed $800 million with no cash available to pay them. This is not a chapter 11 case. Based on the foregoing, the Committee respectfully requests that the Court convert this chapter 11 case to chapter 7.

**McMANIMON, SCOTLAND & BAUMANN, LLC**
*Attorneys for Official Committee of Unsecured Creditors*

Dated: March 2, 2020    By:   */s/ Sam Della Fera, Jr.*
                                     Sam Della Fera, Jr.